UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CENTRAL PUGET SOUND REGIONAL TRANSIT AUTHORITY (a.k.a. SOUND TRANSIT),<br><br>Plaintiffs,<br><br>v.<br><br>LEVEL 3 COMMUNICATIONS, LLC, a Delaware corporation, and MCI COMMUNICATIONS SERVICES d/b/a VERIZON BUSINESS SERVICES, a Delaware corporation,<br><br>Defendants. | No. C10-749 RBL<br><br>ORDER GRANTING SUMMARY JUDGMENT AND DENYING SUMMARY JUDGMENT<br>[Dkt. #s 24, 27, 32] |

This matter comes before the Court on plaintiff Central Puget Sound Regional Transit Authority's ("Sound Transit") motion for partial summary judgment [Dkt. #24] and defendants Level 3 Communications, LLC ("Level 3") and MCI Communications Services Inc., d/b/a Verizon Business Services' ("Verizon") cross motions for summary judgment [Dkt. #27, 32]. All three parties seek a declaratory judgment as to whether Sound Transit has the right to order Level 3 and Verizon to relocate

ORDER GRANTING IN PART
SUMMARY JUDGMENT

their fiber optic utility lines at Level 3 and Verizon's expense. The Court has considered the pleadings filed in support of and in opposition to the motion, and the remainder of the file herein.

BACKGROUND

In December 1990, Verizon's predecessor entered a Right of Way Agreement with the predecessor of Burlington Northern and Santa Fe Railway Company ("BNSF"). Under this agreement, Verizon obtained the right to construct and operate a fiber optic telecommunications system and associated structures along the segment of BNSF's railroad between Seattle, Washington and Eugene, Oregon. BNSF executed a series of Easement Deeds in Verizon's favor and incorporating the Right of Way Agreement in counties along this railroad segment. Verizon recorded an Easement Deed encompassing a segment known as the Lakeview North right of way ("Lakeview North") in the property records of Pierce County, Washington, under AFN 9901220855. In June 1998, BNSF and Level 3 entered into a similar Right of Way Agreement allowing Level 3 to construct and operate a fiber optic transmission system along the same railway.

The Verizon and Level 3 Right of Way Agreements contain substantially similar clauses allowing BNSF to demand that Verizon or Level 3 move their fiber optic systems. The clauses also dictate which party bears the cost of relocating those systems. The agreements state that if the "Railroad" (at that time, BNSF) determines that Level 3 or Verizon's fiber optic utility facilities must be changed "for the relocation or placement of railroad tracks or for BNSF's own operational improvements, or for reasons beyond the control of Railroad," Level 3 or Verizon must relocate their facilities at their own expense. [Dkt. #26] Declaration of Eric Beckman ("Beckman Dec."), Ex.A, § 11(a); *see* Ex. B § 13.2.[1] However, if the Railroad demands relocation of Level 3 or Verizon facilities to accommodate a third party, the Railroad bears the costs and expenses of relocation. *Id*.

Years later, Sound Transit purchased the Lakeview North property from BNSF. Three documents involved in this transaction are important to the present dispute. First, in December 2003, Sound Transit entered a Purchase and Sale Agreement with BNSF regarding the Lakeview North property. This agreement was amended on September 28, 2004 and November 23, 2004. Second, BNSF and Sound

---

[1] Exhibit A of the Beckman Declaration contains the Level 3 agreement, and exhibit B contains the Verizon agreement. The quoted portion of the two agreements are identical except that the Verizon agreement uses the term "Railroad operational improvements" instead of "BNSF's own operational improvements." This difference in language does not impact the disposition of this case.

ORDER GRANTING IN PART
SUMMARY JUDGMENT                    2

Transit entered into a Joint Use Agreement regarding the two entities' shared use of the property. Finally, BNSF conveyed the property to Sound Transit by quitclaim deed on September 28, 2004. BNSF reserved an easement for freight railroad purposes in the deed, and later conveyed this easement to the City of Tacoma, Department of Public Utilities, Beltline Division, Tidelands Division d/b/a/ Tacoma Rail ("Tacoma Rail").

Sound Transit plans on expanding its Sounder commuter rail service to South Tacoma and Lakewood. In 2009, Sound Transit demanded Verizon and Level 3 relocate, at their own expense, their respective fiber optic systems so the expansion project could proceed. Verizon and Level 3 refused. To avoid delaying the expansion project, Sound Transit entered Interim Relocation Agreements with Verizon and Level 3 on September 29, 2009 and November 2, 2009, respectively. Sound Transit agreed to pay the costs for relocating the fiber optic facilities under protest, and reserved the right to seek reimbursement in this legal action.

In its motion for partial summary judgment, Sound Transit seeks a legal determination that it is BNSF's successor in interest and can enforce its associated rights and obligations against Verizon and Level 3.[2] Both Verizon and Level 3 have filed cross motions for summary judgment seeking a declaration that they are not liable to Sound Transit for the costs and expenses incurred in moving the fiber optic facilities.

## DISCUSSION

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477

---

[2] The motion is partial because Sound Transit does not seek a determination of the amount allegedly owed by Verizon and Level 3.

U.S. 242, 248 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." Triton Energy, 68 F.3d at 1221.

As an initial matter, Sound Transit argues that Washington law controls this case, even though the Verizon agreement is explicitly governed by the laws of the State of Texas. In Washington, "there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before Washington courts will engage in a conflict of laws analysis." *Erwin v. Cotter Health Centers*, 161 Wn.2d 676, 692, 167 P.3d 1112 (2007) (citing *Seizer v. Sessions*, 132 Wn.2d 642, 648, 940 P.2d 261 (1997)). Sound Transit argues there is no conflict between Washington and Texas law, and no parties to this case show any conflict or advocate applying Texas law. I thus conduct my analysis under the laws of the State of Washington.

Sound Transit argues that the benefits and burdens of Level 3 and Verizon's utility easements run with the land and were conveyed with the Lakeview North property, regardless of the absence of any affirmative language in a written instrument indicating such. Because Sound Transit has succeeded BNSF as owner of the rail property, Sound Transit argues it possesses BNSF's prior right to demand Level 3 and Verizon relocate their utility lines at their own expense. Sound Transit also cites analogous federal cases from the District of Oregon (concerning a segment of the same Seattle-Eugene railway) ruling in favor of BNSF's successor in interest and against the utility companies.

Neither Level 3 nor Verizon disputes that the benefits and burdens associated with their easements run with the land, nor do they dispute the general rule that a successor in interest to property gains all the benefits and burdens associated with that property, absent an express reservation. *See King County v. Hanson Inv. Co.*, 34 Wn.2d 112, 208 P.2d 113 (1949) (holding that courts will construe a deed as granting a fee simple absolute unless the deed indicates a lessor estate is intended). However, both defendants point out that Washington law, not Oregon law, controls this case. Thus, to the extent Washington law diverts from Oregon law, the federal cases cited by Sound Transit are unhelpful. Defendants argue that under Washington law, Sound Transit has not obtained BNSF's right to demand un-reimbursed relocation of utility lines. Level 3 further argues that, if its motion for summary judgment is denied, there is an issue of material fact rendering partial summary judgment for Sound Transit improper. Because the two

defendants are not identically situated, each is addressed separately.

**I.     Verizon**

Verizon relies chiefly on *Bell v. Gara Fraxa Co.*, 143 Wn. 430, 255 P. 144 (1927), a case it describes as "foundational." Whether this adjective is accurate is debatable; the case is more than eighty years old and does not appear to have been cited by any Washington court. However, neither has it been questioned or overruled. Thus, the rule of law expounded in *Bell* is the law of Washington, and this court will not truncate Washington law by limiting the case to its facts as suggested by Sound Transit.

In *Bell*, the state Supreme Court held that a conveying party may retain as many sticks out of its bundle of property rights as it desires, even with regard to covenants that run with the land. The Briggs and Gardner families owned adjacent lots and entered into a party wall agreement. Under that agreement, the Briggs family financed construction of a wall on the two families' mutual property line, subject to the condition that the Gardners pay half the construction costs should they ever use the wall to build a structure. The Briggs and Gardner families agreed this covenant would run with the land. *Bell*, 143 Wash. at 430-31. The Briggs family conveyed their lot to one Thomas, though they reserved "by separate instrument all of their rights in and to the party wall agreement made in 1909." *Id*. at 431. The Gardners' lot was conveyed to the Gara Fraxa Company, which built a structure using the party wall. Bell, the executor of the Briggs's estate, sued for payment pursuant to the party wall agreement.

The trial court dismissed Bell's complaint under the theory that the Briggs's reservation of the party wall rights was invalid because the covenant ran with the land. The state Supreme Court reversed. The court acknowledged the general rule that covenants that run with the land transfer to a successor in interest, even if the transfer is not expressly stated in the instrument. The court then added, however, that an express reservation of rights, even regarding covenants that run with the land and even by an instrument other than that which created the right, was sufficient to reserve rights that would otherwise be conveyed with the property. The court held that the grantor was free to sell or retain

> as much or as little of his fee as he sees fit. It is a matter of contract between him and his grantee. If he does not see fit to reserve his right under the party wall agreement, it passes. If he does reserve, it does not pass.

*Id*. at 433-34.

When BNSF conveyed its property interest in the Lakeview North property to Sound Transit, it

ORDER GRANTING IN PART
SUMMARY JUDGMENT                5

executed three documents: the Purchase and Sale Agreement, the Joint Use Agreement, and the deed to the property. On the first page of the Purchase and Sale Agreement, BNSF expressly refused to assign its rights related to Verizon's easement to Sound Transit:

> Assignor [BNSF] is not assigning, and Assignor is not assuming, that certain Easement Deed recorded in the real property records of Pierce County under recording number 9901220885 (the "MCI Easement"). However, if Assignee [Sound Transit] requires that the facilities installed by the grantee under the MCI Easement ("MCI") relocate its facilities pursuant to any relocation provision in the MCI Easement, then Assignor shall enforce such relocation provision on Assignee's behalf. Assignor shall have no liability for any failure of MCI to so relocate its facilities.

[Dkt. #25] Declaration of Roger Hansen ("Hansen Dec."), Ex. D, Recital 1. BNSF's intent to retain the benefits and burdens associated with the MCI Easement is underscored by the requirement that Sound Transit go through BNSF when requesting the easement holder, Verizon, relocate its utility facilities. Further, when BNSF and Verizon's predecessor entered the easement agreement, Verizon's predecessor agreed to provide BNSF with interstate communications with an approximate annual present value of $800,000. BNSF continued to receive this benefit, associated with the Verizon easement, after it conveyed the Lakeview North property to Sound Transit. Thus, just as the Briggs family reserved a benefit that ran with the land in *Bell*, BNSF reserved for itself the benefits and burdens of Verizon's easement. Because BNSF retained its rights and obligations associated with the MCI Easement, BNSF alone has the right to enforce terms of the easement agreement with Verizon. Sound Transit has not succeeded BNSF with respect to the easement, and Sound Transit has no authority to force Verizon to relocate at Verizon's expense.

Sound Transit argues that any language in the Purchase and Sale Agreement that purports to allow BNSF to retain these rights is irrelevant; this case is about property law, not contract law. As such, it claims consulting the Purchase and Sale Agreement to determine what property rights BNSF conveyed or retained is improper. Instead, only the conveying deed should be consulted, and the deed itself does not retain the MCI Easement and its associated benefits and burdens to BNSF.

Sound Transit misunderstands *Bell*. In *Bell*, the Briggs family conveyed their land to Thomas but retained, by separate instrument, their rights that otherwise ran with the land. Though the court recognized that this was an issue of contract law, it still held that the contract allowed the Briggs family to retain a right which, under Sound Transit's understanding of property law, would otherwise go to

ORDER GRANTING IN PART
SUMMARY JUDGMENT        6

Thomas.

The same is true here. Even if the deed does not expressly reserve the rights in question to BNSF, the associated Purchase and Sale Agreement does. Under *Bell*, that is sufficient. Admittedly, *Bell*'s holding could create a notice problem with successors in interest if benefits or burdens that run with the land are diverted by separate instruments. This problem is not present in this case, however, because Sound Transit was a party to the conveying deed and the instrument that specifically detached the benefits and burdens associated with Verizon's easement.

Furthermore, here the deed arguably does reserve the rights expressly mentioned in the Purchase and Sale Agreement. The deed expressly incorporates the terms of the Joint Use Agreement, a document which spelled out the terms by which BNSF and Sound Transit were to share use of the railway. The Joint Use Agreement, in turn states that "'Lakeview line' means the property conveyed to Sound Transit pursuant to the Purchase and Sale Agreements . . . to the extent actually conveyed." [Dkt. #29] Declaration of Aaron M. Panner, Ex 3. It is unnecessary for disposition of this case to determine whether this language incorporates the Purchase and Sale Agreement into the Joint Use Agreement (and thus into the conveying deed). If it does, however, then reliance on *Bell* is not necessary; the deed will have contained the very reservation of rights Sound Transit disputes.

Sound Transit also argues that it makes no logical sense for BNSF to have retained the ability to force Verizon to relocate at its expense. This is because BNSF conveyed its freight easement to Tacoma Rail, ending any operational interest in the railway. Though the effect of BNSF's conveyance to Tacoma Rail may be relevant to understanding who possesses the right to force Verizon to relocate at Verizon's expense, it is inconsequential to whether Sound Transit possesses this right. BNSF retained the right when it conveyed an interest in the Lakeview North property to Sound Transit. BNSF's subsequent dealings with Tacoma Rail do not change the fact that Sound Transit failed to acquire the benefits or burdens of the MCI Easement from BNSF. Sound Transit thus does not have the right created by the easement agreement to force Verizon to relocate its utility facilities at Verizon's expense.

**II.     Level 3**

**A.      Right to demand relocation**

The Purchase and Sale Agreement between BNSF and Sound Transit expressly reserves, by

property record number, the MCI Easement associated with Verizon. However, the document is silent regarding the Level 3 Easement. Thus, a different analysis is required.

Level 3 argues Sound Transit lacks authority to order Level 3's relocation at Level 3's expense for three reasons: (1) the conveying deed does not expressly convey the benefits and burdens associated with the Level 3 Easement, (2) Sound Transit did not obtain BNSF's operating rights associated with the railway as required to enforce the relocation clauses, and (3) the deed improperly doubles Level 3's burden by granting the rights associated with the easement to both BNSF and Level 3. Each argument is addressed in turn.

First, Level 3 argues that BNSF failed to convey the benefits and burdens associated with the Level 3 Easement because BNSF did not expressly convey those interests to Sound Transit. As already discussed, benefits and burdens that run with the land need not be expressly conveyed. Absent an express reservation, these rights and obligations transfer to a successor in interest. It is thus irrelevant whether the deed (or any other instrument associated with BNSF's conveyance to Sound Transit) omitted mention of the Level 3 easement. This argument fails as a matter of law.

Second, Level 3 argues that only BNSF or a future grantee of BNSF's then-operating rights can enforce the relocation provision in its easement agreement, and Sound Transit does not fit this description. Section 11(a) of the Level 3 Easement agreement, *supra*, states that the "Railroad" has the right to demand Level 3 move its utility facilities at Level 3's cost. "Railroad" refers to BNSF and "any future grantee of Railroad's operating rights." Beckman Dec., Ex. A, § 11(a). Sound Transit operates as a commuter rail service only, and BNSF has only operated freight on the railway in question. Thus, Level 3 argues that BNSF's "operating rights" are limited to freight, and because Sound Transit only provides commuter service, it is not a future grantee of BNSF's operating rights or successor to BNSF's interest in the Level 3 Easement. This argument is unpersuasive. Level 3 cites no authority for the proposition that BNSF was forbidden from using its railways to transport passengers. That BNSF's operations never included passenger service does not mean BNSF lacked the right to expand its services to include passengers or lease or sell such a right, as it did with Sound Transit. Level 3's interpretation of "operating rights" (and thus "Railroad") is unwarranted. For purposes of the relocation section of the Level 3 agreement, Sound Transit is now the "Railroad" and can invoke the relocation clause against Level 3.

ORDER GRANTING IN PART
SUMMARY JUDGMENT                    8

Finally, Level 3 argues that BNSF effectively doubled Level 3's easement burden when it conveyed the Lakeview North property to Sound Transit. Level 3 points to Exhibit E to the Purchase and Sale Agreement, entitled Assignment and Assumption of Third Party Leases/Easements/Licenses ("Assignments and Assumptions"), which states:

> Assignor [BNSF] and Assignee [Sound Transit] shall each have the right to exercise any right contained in any Third Party Leases/Easements/Licenses or any master agreement related to the Third Party Leases/Easements/Licenses as it relates to the Property to require the other party thereto to relocate its facilities in connection if required or desirable for either of their respective operations or improvements.

Hansen Dec., Ex. D, Recital 1. Level 3 argues that the effect of this provision is to allow BNSF to retain its right to demand Level 3 relocate at Level 3's expense and to also give that same right to Sound Transit, in effect doubling Level 3's burden, and that such a doubling is improper and unjust. Sound Transit does not respond to this argument, and the court finds it persuasive.

BNSF bargained for and obtained certain rights in exchange for granting an easement over its land to Level 3. One such right was the right to demand Level 3's relocation at Level 3's expense. Sound Transit cites no case law, and the court is aware of none, that allows a party to unilaterally expand its rights over another in such a manner as this. This section of the Purchase and Sale Agreement is thus unenforceable: BNSF and Sound Transit do not both have the right to demand Level 3's relocation at Level 3's expense.

Of course, the right still exists; the question is who holds it. As previously discussed, the default Washington state law position is that benefits and burdens that run with the land transfer automatically with the associated property. An exception exists if the grantor expressly reserves such a benefit or burden, as the state's highest court explained in *Bell*. But BNSF made no such express reservation. Therefore, the right transferred to Sound Transit, and Sound Transit may demand Level 3 relocate its utility facilities in accordance with the Level 3 Right of Way Agreement.

**B.     Third party accommodation**

Level 3 claims that, in the event its motion for summary judgment is denied, there are issues of material fact regarding whether Sound Transit ordered the relocation of the utility lines to accommodate a third party. Under Section 11(b) of the easement agreement, if Sound Transit demands Level 3's relocation to accommodate a third party, Level 3 is entitled to reimbursement for its relocation costs and

ORDER GRANTING IN PART
SUMMARY JUDGMENT                    9

expenses. Sound Transit asserts that no plans have been made or modified in order to accommodate any third parties. Level 3 asserts that Sound Transit altered its original plans for the Sounder expansion project in order to accommodate the Washington State Department of Transportation's concerns regarding Amtrak train operations. For reasons stated below, Level 3's asserted factual dispute is irrelevant, and will not preclude resolution of Sound Transit's claims on summary judgment.

Section 11 of the Level 3 Easement agreement with BNSF sets forth the conditions under which Sound Transit, as BNSF's successor in interest, can demand Level 3 to relocate its utility facilities. Subsection (a) states that Level 3 bears relocation costs and expenses if the location of the utility facilities must be changed for any of the following three reasons: (1) "the relocation or placement of railroad tracks or" (2) "for BNSF's own operational improvements, or" (3) "for reasons beyond the control of Railroad." Beckman Dec., Ex. A § 11(a). Subsection (b) states that "[i]f Railroad desires the relocation of a portion of the Level 3 Facilities to accommodate third parties" then Railroad, here Sound Transit, is required to pay the cost and expenses. *Id.* at (b). A problem requiring judicial interpretation arises if, as Level 3 claims, Sound Transit demands Level 3 relocate its facilities due to the relocation or placement of railroad tracks to accommodate a third party.

In construing a contract, "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect[.]" Restatement (Second) of Contracts § 203(a) (1981); *see also Newsom v. Miller*, 42 Wn.2d 727, 731, 258 P.2d 812 (1953). Thus, if one way of construing the Level 3 Easement agreement preserves meaning in all of the clauses and another way of construing the agreement renders one or more clauses meaningless, unreasonable, or unlawful, then the first construction is the proper one.

The United States District Court for the District of Oregon recently interpreted a relocation clause in an easement agreement nearly identical to the one at issue in this case. In *Tri-County Metropolitan Transportation District of Oregon v. MCI Communications Services, Inc.*, No. cv-09-277-HU, 2010 WL 1335010 (D. Or. March 31, 2010) ("Tri-Met"), the Oregon Department of Transportation (ODOT) claimed the right to demand MCI relocate its fiber optic utility facilities, at MCI's expense, due to a railway expansion. ODOT was BNSF's successor in interest to a railway segment in Oregon along the same Seattle-Eugene rail line and thus was the "Railroad" for purposes of the relocation agreement. MCI

argued that ODOT was demanding MCI relocate to accommodate a third party rail operator. Under the terms of the easement agreement, MCI was required to pay for relocation if ODOT determined relocation was necessary due to "(1) relocation or placement of railroad tracks, or (2) operational improvements of ODOT, or (3) reasons beyond ODOT's control." *Id*. at *6. The court concluded that the first condition applied to *any* placement of railroad tracks, including those placed to accommodate a third party. *Id*. at *7. The court reasoned that the first condition, "relocation or placement of railroad tracks," would be completely subsumed in the second condition, "operational improvements of ODOT," if the first condition was limited to the placement of railroad tracks by or for the benefit of the Railroad. Adding tracks are, after all, an operational improvement.[3] In order to keep the first condition from being entirely redundant, it must also apply to tracks placed for third parties.

The court in *Tri-Met* further reasoned that this outcome would not render the third party accommodation clause a nullity. ODOT would still have to pay for relocating MCI's utility facilities if ODOT demanded such to accommodate a third party in situations not involving placement of railroad tracks. *Id*. at *8.

*Tri-Met*'s interpretation of the easement agreement's relocation clause is correct. If Sound Transit demands Level 3 relocate its facilities to accommodate the placement of any railroad track, Level 3 is responsible for the associated costs. If Sound Transit demands relocation to accommodate third parties for another reason, Sound Transit must pay the relocating costs and expenses.[4] Thus, Level 3's asserted factual dispute is irrelevant.

## CONCLUSION

The end result of this case is admittedly less than intuitive: Sound Transit may demand Level 3 relocate its utilities at Level 3's expense, but it may not make the same demand to the similarly situated

---

[3]The court also noted that the term "Railroad" was used to reference BNSF and its successor, ODOT, but that the first condition referenced "railroad" tracks. The court viewed the use of both terms "Railroad" and "railroad" in the same section of the easement agreement as significant. The terms "Railroad" and "railroad" are used in the same way in Level 3's easement agreement.

[4]Level 3 points out that the term BNSF, as opposed to Railroad, is used in the second condition of its relocation clause. Level 3 argues that therefore this condition is restricted to BNSF's operational improvements only and does not extend to BNSF's successors in interest, including Sound Transit. Though the use of different terms in the same section is puzzling, there is no clause that affirmatively limits this condition to BNSF. When Sound Transit acquired BNSF's interest in the Lakeview North property, it stepped into BNSF's shoes except as reserved by the terms of the conveyance. Thus, for purposes of this section of the agreement, Sound Transit is BNSF.

ORDER GRANTING IN PART
SUMMARY JUDGMENT                           11

1  Verizon.  However, that is the result required by the plain language of the relative agreements and the law
2  of the State of Washington.
3       Plaintiff's Motion for Partial Summary Judgment [Dkt. #24] is **GRANTED IN PART** as
4  regarding Level 3 and **DENIED IN PART** as regarding Verizon.  Defendant Verizon's Motion for
5  Summary Judgment [Dkt. #27] is **GRANTED**, and defendant Level 3's Motion for Summary Judgment
6  [Dkt. #32] is **DENIED**.

8       DATED this 26th day of October, 2010.

                                    RONALD B. LEIGHTON
                                    UNITED STATES DISTRICT JUDGE